**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/23/98
THOMAS K. KAHN
CLERK

_____

No. 97-9174
_____

D. C. Docket No. 1:92-CV-658-ODE

R. MAYER OF ATLANTA, INC.,
TONY N. UPCHURCH, d.b.a.
Chuck's Truck, et al.,

                                        Plaintiffs-Appellants,

versus

CITY OF ATLANTA, Georgia,
ELDRIN BELL, Individually and in
his official capacity as Director
of Public Safety for the City of
Atlanta, et al.,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____
**(October 23, 1998)**

Before EDMONDSON and BIRCH, Circuit Judges, and STAFFORD[*],
District Judge.


BIRCH, Circuit Judge:

In this appeal, we determine, as a matter of first impression,

whether the Interstate Commerce Act ("ICA") preempts a

_____

[*] Honorable William Stafford, Senior U.S. District Judge for the Northern District of
Florida, sitting by designation.

municipal ordinance regulating the provision of consensual towing

services. On summary judgment, the district court ruled that,

because consensual towing services do not fall within the scope

of the ICA's preemption provision, the municipal ordinance is

valid. For the reasons set forth below, we conclude that the ICA

expressly preempts municipal ordinances that regulate

consensual towing, and that the ICA does not exempt municipal

ordinances that address safety and insurance requirements. We

therefore vacate the district court's order and remand for further

proceedings.

# I.  BACKGROUND

Appellants (collectively, the "Towing Companies") are the owners and operators of five towing and recovery companies located outside the municipal boundaries of the City of Atlanta.  The Towing Companies provide towing services within the Atlanta municipal limits.

In 1977, the Atlanta City Council adopted several ordinances governing the provision of towing services within city limits.  One ordinance in particular makes it unlawful for "any person . . . to use or operate upon any of the streets of the city a wrecker . . . without having obtained a license granted by the mayor as provided in this section."  City of Atlanta Code of Ordinances § 162-223(a).[1]  In order to obtain a license from the mayor, an applicant must provide: (a) his name and address; (b) his place of business; (c) the nature and character of his business; (d) the names of his partners, if any; (e)

---

[1]  In 1995, the City Council made minor stylistic alterations to, and renumbered the code section of, the ordinance at issue in this case.  R3-54 Exs. A & B.  Although the conduct underlying the Towing Companies' claims occurred prior to the renumbering of the code sections, we will refer to the current section of the code in order to minimize confusion.

the names of all officers, if the applicant is a corporation; (f) a list of the charges to be imposed for the towing services to be provided by the applicant; (g) a description of the type and amount of insurance held by the applicant; and (h) such other information as required by the police or the license review board. Id. § 162-223(b). The same ordinance also makes it unlawful for "any person . . . to use or to operate upon any of the streets of the city any wrecker without having first filed a registration of all these vehicles with the department of police." Id. § 162-223(c). In order to be registered with the police, an applicant must provide: (a) the make, model and manufacturer's number of the towing vehicle; (b) the date the vehicle was put into use as a wrecker; (c) the driver's license numbers of those who will operate the vehicle; (d) the names of insurance companies providing liability coverage for the vehicle; (e) the permit number of each person who will operate the vehicle; and (f) such other information that may be required by the mayor or the mayor's designee. Id.

4

Between October 26, 1990, and May 18, 1992, Atlanta law enforcement officers issued citations to the Towing Companies because they operated tow trucks within the city limits without obtaining the permits required by § 126-223(a) and without registering with the police as required by § 126-223(c). R3-54 Exs. C, D, E, & F. All of the citations involved "consensual tows," which occur when the owner of a vehicle expressly requests towing services to be provided by a specific towing company and enters a private contract with the towing company for the services.[2] All but one of the citations resulted in convictions, requiring the Towing Companies to pay $276 each in fines.

In March 1992, the Towing Companies initiated this action in federal court, seeking declaratory and injunctive relief to bar further enforcement of Atlanta's towing ordinances. The Towing

---

[2] "Nonconsensual" towing services occur when law enforcement or other local authorities determine that a vehicle must be towed and the owner of the vehicle is not afforded the opportunity to request towing services from a specific company. An example of a nonconsensual tow arises when an abandoned car is impounded by police.

Companies also claimed compensatory damages related to their convictions.

On August 23, 1994, Congress enacted the Federal Aviation Administration Authorization Act of 1994 ("FAAA Act"), which became codified as part of the ICA effective January 1, 1995. P.L. No. 103-305, 108 Stat. 1569, 1607 (1994). Section 601 of the FAAA Act amended the ICA to preempt a wide range of state and local statutes and regulations governing intrastate motor carriage. Section 601 created a "general rule" that:

> a State, [or] a political subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.

49 U.S.C.A. § 11501(h) (1995).[3] The FAAA Act also created exceptions to the general preemption rule to authorize state regulations that, among other things, regulate safety, impose highway route controls, limit the size and weight of a motor vehicle

---

[3] As described below, this provision now is codified at 49 U.S.C. § 14501(c)(1).

or the hazardous nature of its cargo, and require mandatory levels of insurance. 49 U.S.C.A. § 11501(h)(2) & (3) (1995). None of the exceptions, however, concerned towing services.

On December 29, 1995, Congress passed the Interstate Commerce Commission Termination Act ("ICCTA") of 1995, which took effect on January 1, 1996. P.L. No. 104-88, 109 Stat. 803, 804. Section 103 of the ICCTA recodified former § 11501(h) as 49 U.S.C. § 14501(c)(1) without altering the provision's "general rule" preempting the state and local regulation of prices, routes, and services provided by motor carriers that transport property. Id., 109 Stat. at 899. The ICCTA, however, added a new exception to the general rule created by § 14501(c)(1):

> [Section 14501(c)(1)] does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle.

49 U.S.C. § 14501(c)(2)(C).

Relying upon these additions to the ICA's preemption provision, the Towing Companies argued that, although municipalities validly may regulate the prices charged for "nonconsensual" towing services, the regulation of consensual towing services is expressly preempted by § 14501(c)(2)C). The district court rejected this argument, concluding that Atlanta's towing ordinance passes muster under the Supremacy Clause. The Towing Companies appeal this ruling.[4]

## II. DISCUSSION

When reviewing a district court's analysis of a claim that federal law preempts state law, we apply the same legal standards that the district court applied in its order awarding summary judgment. Lewis

---

[4] In their Complaint, the Towing Companies claimed that the towing ordinance (a) violates the Commerce and Due Process Clauses of the United States Constitution, (b) is preempted by state law, and (c) tortiously interfered with the Towing Companies' contracts. The Towing Companies raised their federal preemption claim in the context of the parties' cross-motions for summary judgment. In addition to the dismissal of their federal preemption claim, the Towing Companies also appeal the dismissal of their Commerce Clause and due process claims. Because we find the federal preemption claim to be dispositive, we need not consider the Commerce Clause and due process claims raised on appeal.

v. Brunswick Corp., 107 F.3d 1494, 1498 (11th Cir.), cert. granted, --- U.S. ---, 118 S. Ct. 439, 139 L. Ed. 2d 337 (1997), cert. dismissed, --- U.S. ---, 118 S. Ct. 1793, 140 L. Ed. 2d 933 (1998). We therefore review the district court's decision de novo. Id.

## A. PREEMPTION PRINCIPLES

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, state law that conflicts with federal law is "without effect." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S. Ct. 2608, 2617 (1992). Although at issue here is the validity of a municipal ordinance, rather than a state statute, "for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 605, 111 S. Ct. 2476,

2482, 115 L. Ed. 2d 532 (1991) (quoting Hillsborough County v. Automated Medical Lab., Inc., 471 U.S. 707, 712-14, 105 S. Ct. 2371, 2375, 85 L. Ed. 2d 714 (1985)).

Statutes and regulations established under the historic police powers of the states are not superseded by federal law unless preemption is the clear and manifest purpose of Congress. Lewis, 107 F.3d at 1500. Whether a federal statute preempts state law is "a question of congressional intent." Irving v. Mazda Motor Corp., 136 F.3d 764, 767 (11th Cir. 1998) (internal quotation marks omitted).

Federal law preempts state and local laws in three distinct ways: (1) "express preemption," in which Congress defines explicitly the extent to which a federal statute preempts state law; (2) "field preemption," in which state law is preempted because "Congress has regulated a field so pervasively, or federal law touches on a field implicating such a dominant federal interest, that an intent for federal law to occupy the field exclusively may be inferred;" and (3) "conflict

preemption," in which state law "is preempted by implication because state and federal law actually conflict, so that it is impossible to comply with both, or state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Lewis, 107 F.3d at 1500 (internal quotation and citation omitted).

Here, the Towing Companies limit their arguments to express preemption, which is a wise choice. No comprehensive federal regulatory scheme purports to regulate vehicle towing, and Atlanta's towing ordinance does not conflict with, or stand as an obstacle to the accomplishment and execution of, the full purposes and objectives of Congress. We therefore need consider only whether federal law expressly preempts the City's towing ordinance.

## B. EXPRESS PREEMPTION UNDER 49 U.S.C. § 14501(c)(1)

Express preemptive language may be found within the statute itself, in its legislative history, or in regulations promulgated pursuant

to the statute.  Scurlock v. City of Lynn Haven, 858 F.2d 1521, 1523 (11th Cir. 1988).  Because the fundamental question is one of statutory intent, we begin our analysis with the language employed by Congress and the assumption that the ordinary meaning of the language accurately expresses the legislative purpose.  Morales v. Trans World Airlines, 504 U.S. 374, 383, 112 S. Ct. 2031, 2036 (1992).

> The preemption clause enacted in the ICCTA states:
>
> **General Rule.**--Except as provided in paragraphs (2) and (3), a State, [or a] political subdivision of a State, . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.

49 U.S.C. § 14501(c)(1).  A "motor carrier" is defined as "a person providing motor vehicle transportation for compensation."  49 U.S.C.A. § 13102(12).  Motor vehicle transportation by a tow truck for the compensation of the tow truck company, which is at issue in this case, places the towing companies within the definition of a

"motor carrier." Consequently, under the plain, ordinary meaning of the terms used in § 14501(c)(1), the federal statute expressly preempts state and municipal ordinances that regulate the prices, routes, or services provided by towing companies.

This conclusion is strengthened by Congress' addition of a limited exemption to § 14501(c)(1)'s preemptive scope for nonconsensual towing services. Section 14501(c)(2)(C) states that section 14501(c)(1) does not apply to the authority of a state or a political subdivision to enact or enforce an ordinance relating to the price of towing services "if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle." § 14501(c)(2)(C). If Congress had not intended for § 14501(c)(1) to preempt state and local regulation of towing services generally, Congress would not have included an express exemption that applies solely to the prices charged for nonconsensual towing services. Cf. United States v. Smith, 499 U.S. 160, 167, 111 S. Ct. 1180, 1185 (1991) ("Where Congress

explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.") (internal quotation and citation omitted). By including an express exemption for the regulation of prices for nonconsensual towing services, Congress has evinced its intent that all aspects of consensual towing services remain subject to the general rule set forth in the preemption clause.

Defendants-Appellees (the "City Defendants") argue that this interpretation of Congress' preemptive intent is inconsistent with 49 U.S.C. § 13506(b), which lists several narrowly defined exceptions to the ICA's general grant of jurisdiction to the Secretary of Transportation and the Surface Transportation Board. Section 13506(b) provides that:

> [e]xcept to the extent the Secretary or Board, as applicable, finds it necessary to exercise jurisdiction to carry out the transportation policy of section 13101, neither the Secretary nor the Board has jurisdiction under this part over–

> (1) transportation provided entirely in a municipality . . . [or]
>
> (3) the emergency towing of an accidentally wrecked or disabled motor vehicle.

§ 13506(b)(1) & (3). According to the City Defendants, the sections quoted above limit the preemptive effect of § 14501(c)(1) to the extent that Atlanta's towing ordinance regulates transportation that is (a) provided entirely within city limits or (b) related to the emergency towing of disabled vehicles.

Although several courts have adopted the City Defendants' argument, these courts rendered their decisions prior to the effective date of the ICCTA in 1996. See Interstate Towing Ass'n, Inc. v. City of Cincinnati, 6 F.3d 1154, 1158 n.4 (6th Cir. 1993) (interpreting § 13506(b) and § 11501(h), which did not contain the exemption for nonconsensual towing, to reflect an intent not to preempt local towing ordinances); Giddens v. City of Shreveport, 901 F. Supp. 1170, 1183 (W.D. La. 1995) (same); 426 Bloomfield Ave. Corp. v. City of Newark, 904 F. Supp. 364, 369-70 (D.N.J. 1995) (same).

15

Cases published after the effective date of the ICCTA have rejected this argument by focusing attention upon the express reference to nonconsensual towing services contained in the amended form of § 14501(c)(2)(C). See, e.g., Harris County Wrecker Owners for Equal Opportunity v. City of Houston, 943 F. Supp. 711, 722 (S.D. Texas 1996) ("The addition of § 14501(c)(2)(C) confirms congressional intent in § 14501(c)(1) to preempt state and local towing regulations."); Ace Auto Body & Towing, Ltd. v. City of New York, No. 96-Civ.-6547(DLC), (S.D.N.Y. Oct. 28, 1997) ("There is little doubt that Congress has expressly preempted the intrastate towing industry from local regulation through Section 14501(c) of Title VI."). We agree with the reasoning of the Harris County and Ace Auto Body courts in that the express reference to towing services in § 14501(c)(2)(C) provides conclusive evidence that Congress intended to extend the general rule of preemption to those aspects of the towing industry that are not listed within the exception.

Furthermore, we note that, although § 13506(b) restricts the Secretary's and the Board's jurisdiction in several narrowly defined contexts, § 13506(b) also permits the Secretary and the Board to exercise jurisdiction when "necessary . . . to carry out the transportation policy of [49 U.S.C. §] 13101." § 13506(b). The transportation policy of § 13101 is defined broadly to include the regulation of transportation by motor carriers and the promotion of "competitive and efficient transportation services." § 13101(a)(2). More specifically, the policy calls upon the federal government to, among other things:

> (a) encourage fair competition, and reasonable rates for transportation by motor carriers of property;

> (b) promote efficiency in the motor carrier transportation system . . .;

> (c) meet the needs of shippers, receivers, passengers, and consumers; [and]

> (d) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and traveling public.

§ 13101(a)(2)(A)-(D). One of the ways in which Congress has undertaken to accomplish the policies and goals set forth in § 13101 is by deregulating certain components of the transportation industry, as revealed by express preemption provisions such as § 14501(c)(1). In other words, §§ 14501(c)(1) & (2) reflect Congress' determination that state and local regulation of the towing industry–with the narrow exception of regulations for the price of nonconsensual towing services–disturbs the development of competitive and efficient transportation services. We therefore conclude that enforcement of § 14501(c)(1) in the context of this case does not contravene § 13506(b), because the exercise of jurisdiction is necessary to accomplish the policy objectives set forth in § 13101.

Even if we assume that the simultaneous application of §§ 14501(c)(1) and 13506(b) creates an apparent inconsistency, any ambiguity regarding Congress' intent is readily resolved by examining the ICCTA's legislative history. The House Report

accompanying the proposed version of § 14501(c)(2)(C) states that the purpose behind the amendment is to:

> provide[] a new exemption from the preemption of State regulation of intrastate transportation relating to the price of non-consensual tow truck services. This is only intended to permit States or political subdivisions thereof to set maximum prices for non-consensual tows, and is not intended to permit re-regulation of any other aspect of tow truck operations.

H.R. Rep. No. 104-311, at 119-20 (1995) (emphasis added), reprinted in 1996 U.S.C.C.A.N. 793, 831-32. Congress thus limited the exception to include only those regulations that address the prices of nonconsensual towing, while leaving undisturbed the preemptive effect of the statute as it pertains to all other aspects of the towing industry. As noted prior to the amendment's passage, "[t]he pending legislation would restore the local authority to engage in regulating the prices charged by tow trucks in non-consensual towing situations. Regulation of routes and services, as well as regulation of consensual towing, would still be preempted." 141 Cong. Rec. H15602 (1995) (statement of Rep. Rahall) (emphasis

added). The legislative history thus reveals Congress' intent to preempt any State or local ordinance that regulates the provision of consensual towing services.

For these reasons, we conclude that § 14501(c)(1) expressly preempts municipal ordinances that are "related to" the price, route, or provision of consensual towing services. Section 162-223(a)-(c) of Atlanta's Municipal Code is "related to"[5] the provision of consensual towing services because the ordinance limits who is permitted to provide the services and requires that individuals and companies satisfy various criteria before they provide the services. Section 162-223(a)-(c) therefore is preempted under § 14501(c)(1).

---

[5] Congress used identical language in a similar provision found in the Airline Deregulation Act of 1978, now codified at 49 U.S.C. § 41713(b), and expressed an intent that § 14501(c)(1) and § 41713(b) "function in the exact same manner with respect to [their] preemptive effects." H.R. Conf. Rep. No. 103-677, at 85 (1994), reprinted in 1994 U.S.C.C.A.N. 1715, 1757. In Morales v. Trans World Airlines, Incorporated, 504 U.S. 374, 112 S. Ct. 2031 (1992), the Supreme Court held that the "related to" language contained in § 41713(b) results in preemption of any state or local law that has a "connection with or reference to" airline rates, routes, or services. 504 U.S. at 384, 112 S. Ct. at 2037 (applying 49 U.S.C. § 1305(a), the precursor to § 41713(b)). Consequently, § 14501(c)(1) preempts the state or municipal ordinance to the extent that the ordinance has a "connection with or reference to" the price, routes, or provision of consensual towing services.

## C. EXCEPTIONS TO 49 U.S.C. § 14501(c)(1)

The City Defendants argue that, even if §§ 162-223(a)-(c) are preempted under § 14501(c)(1), the ordinances nonetheless are valid under an exception designed to allow states to regulate motor vehicle safety and to enact minimum insurance requirements. Section 14501(c)(2)(A) excepts from the preemptive scope of § 14501(c)(1) "the safety regulatory authority of a State with respect to motor vehicles" and "the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization." § 14501(c)(2)(A). The exception thus authorizes a "State" to enact safety and insurance-related regulations, but is conspicuously silent regarding the authority of a municipality or any other political subdivision of a state to enact such regulations. The Act itself defines the term "State" to "mean[] the 50 States of the United States and the District of Columbia," and therefore provides no justification for reading the term "State" to include its political

subdivisions. 49 U.S.C. § 13102(18). To support their argument, the City Defendants rely on Harris County, in which the court construed § 14501(c)(2)(A) to permit a municipality to enact safety regulations if the state expressly has delegated its regulatory authority to its political subdivisions. Harris County, 943 F. Supp. at 726-27; see also AJ's Wrecker Serv., Inc. v. City of Dallas, Nos. Civ. A. 3:97-CV-1311D, Civ. A. 3:97-CV-2398D, 1998 (N.D. Texas April 15, 1998) (construing § 14501(c)(2)(A) in the same manner as Harris County).

We are unpersuaded by this argument for four reasons. First, the argument ignores the presumption that, when Congress omits certain language in a particular subsection of a statute and includes the language in other subsections, the omission is intentional rather than accidental. See BFP v. Resolution Trust Corp., 511 U.S. 531, 537, 114 S. Ct. 1757, 1761, 128 L. Ed. 2d 556 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but

omits it in another.") (internal quotation marks omitted).  The statute at issue here presents a particularly appropriate opportunity to apply this interpretive rule, as § 14501 contains no fewer than seven express references to the regulatory authority of the political subdivisions of the states in its other subsections, §§ 14501(a), 14501(b), 14501(c)(1), 14501(c)(2)(C), 14501(c)(3)(A), 14501(c)(3)(B), and 14501(c)(3)(C), but omits any references to political subdivisions in § 14501(c)(2)(A).  In fact, § 14501(c)(2)(A) is the only subsection of the statute that mentions the regulatory authority of a state without also mentioning the regulatory authority of the state's political subdivisions.  We find it unlikely that this omission reflects a drafting error, because a similar preemption provision contained in the Airline Deregulation Act, 49 U.S.C. § 41713(b)(4)(B)(I), contains the same omission.  For these reasons, we view Congress' omission of a reference to a state's political subdivisions from § 14501(c)(2)(A) as a manifestation of Congress'

intent that municipal safety and insurance regulations are not exempted from the preemptive scope of § 14501(c)(1).

Second, this interpretation is consistent with the policy objectives underlying the ICCTA. As stated above, the ICCTA is the product of Congress' desire to foster increased competition in the motor transportation industry. To achieve this end, Congress identified a need to eliminate a tangled web of state and local ordinances that regulated the transportation of property, as evidenced in the conference report accompanying the ICCTA:

> [T]he conferees believe preemption legislation is in the public interest as well as necessary to facilitate interstate commerce. State economic regulation of motor carrier operations causes significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtails the expansion of markets. . . . The sheer diversity of these regulatory schemes is a huge problem for national and regional carriers attempting to conduct a standard way of doing business.

H.R. Conf. Rep. 103-677, at 87 (1994), reprinted in 1994 U.S.C.C.A.N. 1715, 1759. By withholding the authority to enact safety and insurance regulations from political subdivisions,

Congress ensured that counties and municipalities would not enact differing (and perhaps inconsistent) sets of safety and insurance ordinances. Stated differently, it is reasonable to assume that Congress decided that safety and insurance ordinances must be enacted on a statewide level, in order to minimize the disturbance to the motor transportation industry that a patchwork of local ordinances inevitably would create.[6]

Third, we are not persuaded by the City Defendants' arguments that the Supreme Court's decision in <u>Wisconsin Public Intervenor v. Mortier</u>, 501 U.S. 597, 111 S. Ct. 2476, 115 L. Ed. 2d 532 (1991),

---

[6]  For example, a tow truck providing consensual towing services from a location in downtown Atlanta to a location in Northwest Georgia may pass through nearly a dozen political subdivisions of the State of Georgia that, under the City Defendants' reading of the statute, would possess the authority to enact safety and insurance regulations for tow truck companies. The number of political subdivisions rises dramatically in situations where the towing services originate in Atlanta and end in North Florida, as is the case for at least one of the Towing Companies that instituted this action. The cost for a towing company to maintain compliance with all these political subdivisions' ordinances would add up quickly, resulting in the "inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology" that Congress sought to eliminate by enacting the ICCTA. H.R. Conf. Rep. 103-677, at 87 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 1715, 1759 In addition, if each political subdivision required tow trucks to display some type of registration number or permit, compliance with all of the ordinances might become a physical impossibility as the number of permits outpaced the available space on the truck. By requiring that safety and insurance ordinances must be enacted on a statewide basis, the costs associated with complying with the ordinances are reduced dramatically, which is an outcome that is consistent with the policy objectives of the ICCTA.

compels a contrary conclusion. The respondent in Mortier argued that, because the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), codified at 7 U.S.C. § 136 et seq., contains a provision that expressly authorizes a "State" to regulate pesticides under certain conditions but does not mention political subdivisions, the provision preempts local regulation of pesticides. 501 U.S. at 606-07, 111 S. Ct. at 2482-83; see also 7 U.S.C. § 136v (FIFRA's preemption provision). The Mortier Court observed that, under FIFRA, the term "State" is not "self-limiting" because "political subdivisions are merely subordinate components" of the state itself. 501 U.S. at 612, 111 S. Ct. at 2485. Since "the exclusion of political subdivisions cannot be inferred from the express authorization to the 'State[s],'" the Court observed that "the more plausible reading of FIFRA's authorization to the States leaves the allocation of regulatory authority to the 'absolute discretion' of the States themselves, including the option of leaving local regulation of

pesticides in the hands of local authorities." Id. at 608, 111 S. Ct. at 2483.

Mortier, however, falls short of establishing a rule that the word "state" must be interpreted to include political subdivisions in all circumstances. Significantly, the provision interpreted in Mortier includes no references to political subdivisions whatsoever, and FIFRA as a whole contains only "scattered mention" of political subdivisions in its other parts. See Mortier, 501 U.S. at 612, 111 S. Ct. at 2485; 7 U.S.C. § 136v. Moreover, the Court found FIFRA's legislative history to be too "complex and ambiguous" to support a contrary result. 501 U.S. at 612, 111 S. Ct. at 2485. Section 14501, on the other hand, contains no fewer than seven subsections that expressly preclude or authorize rulemaking by political subdivisions, while the subsection at issue in this case conspicuously omits any reference to political subdivisions. See United States v. Denver, 100 F.3d 1509, 1513 (10th Cir. 1996) (declining to interpret CERCLA's preemption clause to encompass political subdivisions despite

<u>Mortier</u> when surrounding statutory language permits inference that "[i]f Congress had wished to include local zoning ordinances within the definition of "state law" it would surely have so stated"); <u>see also</u> <u>Ohio Mfr. Ass'n v. City of Akron</u>, 801 F.2d 824, 829 (6th Cir. 1986) (listing federal preemption statutes that include the term "political subdivisions" and concluding that Congress "did not simply overlook including political subdivisions" in the Occupational Safety Act's preemption provision). Furthermore, as we stated above, our conclusion is consistent with the ICCTA's legislative history.[7] <u>Cf.</u> <u>Denver</u>, 100 F.3d at 1513 ("[w]e will not apply <u>Mortier</u> in this context when to do so would produce a result so contrary to the overall

---

[7] It is worth observing that the context in which the <u>Mortier</u> Court interpreted the term "State" may have influenced the Court's conclusion as well. In <u>Mortier</u>, the Court faced a claim that the use of the word "State" without mentioning political subdivisions revealed Congress' "clear and manifest purpose" to preempt local regulation. In response, the Court held that Congress' silence concerning political subdivisions is not sufficient to satisfy this rigorous standard. 501 U.S. at 608-09, 612, 111 S. Ct. at 2483-85. Section 14501(c)(1), on the other hand, expressly preempts all state and local regulation of certain aspects of the motor transportation industry, and the question we must answer is whether Congress' silence in an exception to this rule implies that political subdivisions are to be included within the exception. The Michigan Supreme Court addressed this distinction when construing an exception to the Federal Railroad Safety Act's preemption clause and concluded that "[j]ust as the statutory silence in <u>Mortier</u> was insufficient to establish preemption in the first place, so the statutory silence here is insufficient to overcome the preemption otherwise expressly mandated by the statute." <u>Grand Trunk W. R.R. Co. v. City of Fenton</u>, 482 N.W.2d 706, 709-10 (Mich. 1992).

objectives of CERCLA as expressed consistently in the Act itself, as well as its legislative history"). For these reasons, <u>Mortier</u> can be distinguished on its facts, and its construction of the word "State" need not govern our analysis.

Fourth, we are not persuaded by the <u>Harris County</u> court's observation that interpreting § 14501(c)(2)(A) in a way that preempts municipal safety ordinances would create an irreconcilable conflict with the preemption provisions contained in the Hazardous Materials Transportation Authorization Act of 1994 ("HTMA Act"), <u>codified at</u> 49 U.S.C.A. § 5101 <u>et seq</u>. <u>See</u> 943 F. Supp. at 727. Specifically, the HTMA Act permits a "State, political subdivision of a State, or Indian tribe" to enact ordinances governing the routes used by hazardous materials carriers so long as the ordinances are not "inconsistent" with federal standards and laws governing hazardous materials transportation. <u>See</u> <u>Jersey Cent. Power & Light Co. v. Township of Lacey</u>, 772 F.2d 1103, 1113 (3d Cir. 1985) (holding that municipal law is preempted by what is now codified as 49 U.S.C. §

29

5125 of the HTMA). It is possible, however, to read § 14501(c)(1) and § 5125 in a way that gives effect to both statutes. Cf. Blanchette v. Connecticut General Ins. Corp., 419 U.S. 102, 133, 95 S. Ct. 335, 353, 42 L. Ed. 2d 320 (1974) (two statutes should be read in a manner that gives effect to both unless there exists a "clearly expressed congressional intention to the contrary") (internal quotation and citation omitted). Specifically, § 14501(c)(1) states a "general rule" regarding preemption, which implies that Congress left the door open for any exceptions that are recognized in other parts of the ICA. The HTMA's preemption provision thus may be read as a narrow exception to the general preemptive scope of § 14501(c)(1) that applies to the routing of hazardous materials carriers.[8] This reading comports with the interpretive rules set forth in the preceding section, because even though Congress included the term "political

---

[8] The scope of this exception to § 14501(c)(1)'s general preemption rule is very narrow indeed, because the HTMA permits a municipality to regulate the routes used by hazardous materials carriers only if the regulations are not "inconsistent" with existing federal regulations. A municipal routing regulation is "inconsistent" with federal regulations if it "prohibits or otherwise affects transportation on routes or at locations" authorized by federal regulations. Jersey Cent. Power, 772 F.2d at 1113.

subdivisions" in the relevant portions of § 5125, the term is conspicuously absent from other provisions that affect preemption under the HTMA. See 49 U.S.C. § 5112(b) (authorizing states and Indian tribes, but not political subdivisions, to designate highway routes over which carriers may transport hazardous materials). Consequently, we do not agree that our construction of § 14501(c)(1) creates an irreconcilable conflict with the preemptive provisions of the HTMA.

For all these reasons, we conclude that §§ 162-223(a)-(c) do not fall within the exceptions for safety and insurance regulations contained in § 14501(c)(2)(A). The ordinances therefore are expressly preempted by § 14501(c)(1).[9]

---

[9] The City Defendants argue that, if we conclude that any portion of the towing ordinance is preempted, we should also conclude that these portions are severable from the remaining ordinances that affect towing services. The Towing Companies, however, do not challenge the validity of any ordinances except §§ 162-223(a)-(c), and the Atlanta Code by its terms preserves those parts of its ordinances that are not expressly declared to be invalid by a court of competent jurisdiction. City of Atlanta Code of Ordinances § 1-10. Consequently, we need not address the severability of §§ 162-223(a)-(c) from any other parts of the Atlanta Code, and we need not address the validity of any ordinances other than those expressly challenged by the Towing Companies.

## III. CONCLUSION

For the foregoing reasons, we conclude that §§162-223(a)-(c) of the Atlanta Code of Ordinances are preempted by 49 U.S.C. § 14501(c)(1) and are therefore unenforceable. We therefore VACATE the district judge's entry of summary judgment in favor of the City Defendants with respect to this issue, and REMAND the case to the district court for further proceedings consistent with this opinion.